UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

In Re:                        :
                              :     HONORABLE JOSEPH E. IRENAS
TRI-STATE ARMORED SERVICES,   :
INC.,                         :   CIVIL ACTION NO. 06-2226 (JEI)
                              :
          Debtor.             :          **OPINION**
-----------------------------:
GREAT AMERICAN INSURANCE      :
COMPANIES, INC.,              :
                              :
          Appellee,           :
                              :
     v.                       :
                              :
THOMAS J. SUBRANNI, ESQ., as  :
the trustee of the estate of  :
Tri-State Armored Services,   :
Inc., et al,                  :
                              :
          Appellants.         :


**APPEARANCES:**

SUBRANNI & OSTROVE, & ZAUBER
By:  Nona Lee Ostrove
1020 Laurel Oak Road,
Suite 100
Voorhees, NJ 08043
     Counsel for Appellant Thomas J. Subranni, Esq., as trustee
     for the estate of Tri-State Armored Services, Inc.

SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Michael J Barrie
Suite 3600
1600 Market Street
Philadelphia, PA 19103
     Counsel for Appellant NCR Corporation

STEVENS & LEE A PA PROF CORP
By:  Ronald L. Glick
1415 Route 70, East Suite 506
Cherry Hill, NJ 08034
     Counsel for Appellant Diebold, Inc.

WOLF, BLOCK, SCHORR, & SOLIS-COHEN, LLP
By:  Gregory A. Lomax
1940 Route 70 East
Suite 200
Cherry Hill, NJ 08003
     Counsel for Appellant American Express Travel Related
     Services Company, Inc.

Barbara Lanza Farley
13 Wilkins Avenue
Haddonfield, NJ 08033
     Counsel for Appellant Palm Desert National Bank


FRANZBLAU DRATCH, PC
By:  Stephen N. Dratch
Plaza One
354 Eisenhower Parkway
PO Box 472
Livingston, NJ 07039-0472
     Counsel for Appellee Great American Insurance Companies,
     Inc.

**IRENAS**, Senior District Judge:

Appellants appeal from two Orders for Judgment issued on October 21, 2005, and March 29, 2006, by the United States Bankruptcy Court for the District of New Jersey (Wizmur, J.), granting Appellee's request to rescind an insurance contract and dismissing Appellants' counterclaims.[1]  (TA at pp. 120 and 224). For the reasons set forth below, this Court affirms the Bankruptcy Court's orders.

---

[1]  The Court applies New Jersey state law in this case.  *See Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 337 (3d Cir. 1984).  Parties do not dispute the application of New Jersey law.

2

## I.

Tri-State Armored Services, Inc. ("Tri-State") was an armored car company in the business of servicing ATMs owned by financial institutions.  Tri-State was incorporated on or about September 15, 1997, after purchasing all assets from its predecessor, Executive Cash.  The shareholders of Tri-State were Barry Chesla, William A. Mottin, and Daniel C. Feuker.[2]

Mottin was the manager, the operational head, and the decision maker at Tri-State, and Feuker ran the armored cars of the operation.  They both stationed in Tri-State's administrative headquarters in Hammonton, New Jersey.  Chesla was the CEO, stationed in Ligonier, Pennsylvania.  He did not participate in Tri-State's daily operations.  He resigned his position some time in 1998, and redeemed all of his Tri-State stock.  Chesla owned the Ligonier facilities and remained Tri-State's landlord.


### A. Tri-State's Losses

When Tri-State terminated operation on March 1, 2001, its customer claims ($54.6 million) exceeded the funds recovered by the trustee ($21.9 million) by $32.7 million.  Of this shortfall, approximately $12.4 million of losses are attributable to: (1) the conversion of customer funds by Mottin, Feuker, Nicholas

---

[2]  Initially, there were two more shareholders, Thomas J. Thorton, III (18%) and Kenneth D. Bacan (20%).  Their shares were later acquired by Chesla.

Basile, and Joseph Fernandez; (2) miscellaneous incidents of theft and losses; and (3) misappropriations by Chesla.  Over $19 million of losses are unexplained.

Within a month of its formation, Tri-State began to make unauthorized "borrowing" from its wire account and cash vault to pay operating expenses.  Most customers wired money into Tri-State's wire account or had cash delivered to the Tri-State's cash vault.  Several customers provided funds by check, which should have been deposited into the wire account; instead, the checks were often deposited into Tri-State's operating accounts.

The diversion of funds from Tri-State's wire account and cash vault occurred at the direction of Mottin and Feuker.  The funds were primarily used for Tri-State's operating expenses.  Tri-State designated these funds as "due to vault" or "change" on its books.  Some funds were returned to the vault and to the wire account over the course of Tri-State's operation.  The customers had no knowledge of such "borrowing."  Approximately $8.4 million of customer funds were transferred from the Tri-State cash vault and wire account and utilized for Tri-State operating expenses.  In addition, approximately $315,000 was kept for personal use by Tri-State's employees, including $75,000 to Feuker.  Mottin claims that he always intended to pay back the "borrowing" from anticipated future profits, and thought of each borrowing as "an interest-free loan."

During the summer of 2000, Tri-State came under IRS investigation.  On or about August 31, 2000, Mottin resigned as president of Tri-State, although he remained an employee, with no adjustment in salary.  In September 2000, other key employees, including Michael Ricchi and David DeFebbo, Tri-State's director of security, resigned.  After Mottin's resignation, Nicholas Basile and Joseph Fernandez took over.

Basile was hired by Mottin in the summer of 1999.  He was in his early 30s and had no experience with ATM operations prior to his employment with Tri-State.  In September 2000, he became president of Tri-State because he "drew the short straw" following Mottin's resignation.  As the president, Basile had limited knowledge about the company, and consulted with Mottin daily regarding most company-related decisions.  From time to time, he also consulted with Fernandez.  Fernandez became general manager of the company after Basile became president.  Both Basile and Fernandez took at least one check from the Tri-State wire account, which consisted entirely of customer funds, on or about February 21, 2001.  They each pled guilty to federal charges in connection with the conversion of customer funds.

In February 2001, Mottin, Basile, and Fernandez realized that Tri-State would not be able to repay the missing funds it "borrowed" from its customers.  At that point, they decided to cease operation.

In addition to conversion by Tri-State's employees, the company experienced many incidents of theft and loss. David DeFebbo testified that Tri-State frequently reported daily cash shortages of over $100. Such shortages were common and very difficult to trace because they were not only attributable to employee theft, but also to a lack of control in the cash room, machine failure, human error and accounting mistakes. When a shortage occurred, Tri-State would report that the daily balance was accurate even though the money wasn't there.

Each time a customer made a claim, Tri-State paid the customer by taking money from another customer and turning it over to the claimant. According to the accountant's report submitted to the trustee, approximately $421,000 can be identified as missing ATM customer funds attributable to various incidents.

The third source of loss for Tri-State is Chesla's misappropriations. While Tri-State was still operating, a federal investigation ensued against Chesla. Federal agents raided Chesla's office at the Ligonier facility in May 2000. The raid was publicized in newspapers, particularly in western Pennsylvania. At the time, Chesla was no longer associated with Tri-State except as the landlord of the Ligonier facility. On September 18, 2001, Chesla pled guilty to charges of money laundering and tax evasion.

6

B. Tri-State's Insurance Coverage

Tri-State's customers require it to secure comprehensive employee dishonesty, crime and disappearance insurance.  On or about September 10, 1997, Mottin completed an armored car operator's proposal form for Lloyds of London on behalf of Tri-State, and forwarded it to Marshall & Sterling ("M&S"), the insurance agent for Executive Cash.  Lloyds declined to offer coverage for Tri-State.

Ron Bray, the armored car specialist at M&S, then submitted Tri-State's application to Great American, noting that Lloyds of London had declined to offer coverage because a loss was currently under investigation.  Sean Missal, the Great American underwriter who reviewed Tri-State's application, knew that Executive Cash's insurance coverage was not renewed by Lloyds.

On or about September 18, 1997, Missal hired AMSEC International, Inc. ("AMSEC"), a security firm, to perform a security survey of Tri-State's facility at Hammonton.  A security survey report issued by AMSEC recommended numerous improvements in Tri-State's security systems and procedures.  The report was forwarded to Missal with a note that a follow-up inspection within 90-120 days was recommended.

A Tri-State application for insurance coverage was submitted to Great American on October 7, 1997.  Mottin signed the application.  On October 10, 1997, Great American offered

coverage to Tri-State, contingent on the submission of a revised armored car application, a written agreement from Tri-State that it would comply with the recommendations listed in the AMSEC report within 60 days, and a written recitation from Tri-State of the five-year loss history of Executive Cash, including a description of any open claims.

Great American issued a comprehensive employee dishonesty, crime and disappearance insurance policy to Tri-State on October 20, 1997.  On December 9, 1997, Tri-State requested additional vault coverage, which Great American approved.  By then, at least $80,000 had been removed from the vault by Tri-State for use in its operating account.

The Great American policy was renewed in October 1998 using a renewal insurance application that was nearly identical to the prior year's application.  The 1998 insurance application was signed by Mottin on October 13, 1998.  In response to questions (the "loss history questions") regarding "[a]ll claims or occurrences that may give rise to claims for the prior five years", Mottin responded "N/A."  Under "Please provide descriptions of all losses in excess of $5,000, including corrective action," Tri-State gave no response.  Great American conducted no follow-up investigation and renewed the policy.

Prior to the October 1999 renewal process, at Mottin's request, Great American directed AMSEC to conduct a security

8

survey of the Tri-State Ligonier facility.  Herbert R. Cunningham, the AMSEC employee who conducted the survey, wrote to Missal on September 14, 1999, that there were five areas of "significant concerns," including access control, alarm coverage, liability storage, liability staging and accountability.

Tri-State filed a renewal application again for 1999.  In connection with the underwriting process for the 1999 policy, Missal prepared a Risk Analysis and Summary Form, or "CURE sheet", which is an overview of the account for underwriting and pricing purposes.  The 1999 CURE sheet is the only one Great American produced in connection with Tri-State's renewal policies, and the only negative note on the CURE sheet was the absence of random credit checks of employees.  Tri-State's answers to the loss history questions on the renewal application remained the same as in 1998.

On June 22, 2000, an AMSEC employee faxed to Great American underwriters Missal and Scheckton an article from the Pittsburgh Post-Gazette dated June 10, 2000, regarding the raid on Chesla in Ligonier Township.  The article reported that Chesla was under investigation by the FBI and the IRS for "pilfering millions of dollars meant for automatic teller machines" and "for allegedly stealing money from the company starting in 1996."  In response to the article, Missal and Scheckton requested that Bray inquire about the facts alleged in the article.  When contacted, Mottin

assured Bray that the investigation involved only Chesla, and did not involve Tri-State or any of Tri-State's customers.  Bray communicated that message back to Missal and Scheckton.  Great American did no further investigation.

Basile submitted the renewal application for October 2000 as the president, and no claims or losses were reported.  Great American again renewed the policy.  Following the renewal of coverage, Tri-State, M&S, and Great American made no further contact until February 26, 2001, when Basile called Bray to advise him that Tri-State was ceasing operation, and that there may be a significant shortfall in customer cash.  In turn, Bray reported the news to Great American, which immediately retained AMSEC to investigate the prospective loss.

### C. Loss Payees

Tri-State contracted directly with Appellants Diebold, Inc. ("Diebold") and NCR Corporation ("NCR"), who in turn contracted with financial institutions to service their ATMs.  Appellants American Express Travel Related Services Company, Inc. ("American Express") and Palm Desert National Bank ("Palm Desert") were customers whose ATMs Tri-State directly serviced.  Diebold, NCR, and American Express were designated as "loss payees."[3]

---

[3]  Palm Desert was the holder of a Certificate of Insurance from Great American, and did not have a formal designation of loss payee.  Nevertheless, it is unnecessary to distinguish Palm

Tri-State was the named insured on the policy issued by Great American in 1997, and renewed each year through 2000.[4]  In paragraph 12 of Section A, General Conditions, of the "Crime General Provisions" provides:

> 12. Ownership of Property; Interests Covered:  The property covered under this insurance is limited to "customer's" property:
>
> (a) that you hold; or
> (b) for which you are legally liable.
>
> However, this insurance is for your benefit only.  It provides no rights or benefits to any other person or organization.

(TA at p. 13).

The "Joint Loss Payable" endorsement to the Great American policy, naming Diebold and NCR as "loss payees", provides:

JOINT LOSS PAYABLE

A.   PROVISIONS

> You agree that any loss payable under the Coverage Form indicated above shall be paid jointly to you and the Loss Payee, as their interests may appear, designated below:
>
> Diebold, Inc.
> (NAME OF LOSS PAYEE)
>
> . . .

C.   No rights or benefits are bestowed on the Loss Payee other than payment of loss as set forth herein.

_____

Desert from the other loss payees.

[4]  Under the "Crime General Provisions" form appended to the policy, the terms "you" and "your" refer to Tri-State.

(TA at p. 14-15).

As stated, the policy was explicitly for the benefit of Tri-State only.  The loss payees were only afforded the right to be paid jointly with Tri-State for any covered losses sustained by Tri-State under the policy.  (TA at p.231).  The Bankruptcy Court found no evidence that Great American actually knew, prior to the issuance of the insurance policies and loss payee endorsements each year, that employee theft of customer funds had occurred at Tri-State.

### D. Bankruptcy Court Opinion

Tri-State filed a Chapter 7 petition on March 2, 2001. Great American filed an adversary proceeding on June 4, 2001, seeking a declaratory judgment that Tri-State's Comprehensive Employee Dishonesty, Crime and Disappearance Insurance policies should be rescinded and that the Tri-State bankruptcy estate was not otherwise entitled to insurance coverage on its claims.[5]

The trustee made four counterclaims: (1) breach of the implied covenant of good faith and fair dealing; (2) violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 et seq.; (3) breach of an alleged fiduciary duty owed by Great American to

---

[5]  Great American sought rescission of the policies for the years 1997 through 2000.  However, the trustee limited its claims of the bankruptcy estate to only those arising under the policies that Great American issued in 1999 and 2000.

Tri-State; and (4) spoliation or concealment of evidence.  The loss payees asserted five claims against Great American.  The Bankruptcy Court dismissed four of them; only the claim for equitable estoppel was tried.

After a 17-day trial, the Bankruptcy Court concluded that Great American was entitled to rescission of the policy because Tri-State knowingly provided untruthful answers to the questions regarding "occurrences that may give rise to claims" and "descriptions of all losses in excess of $5,000, [and] corrective action."  It was undisputed that when both the 1999 and 2000 renewal applications were completed and sent to Great American, Mottin was well aware of, and personally responsible for, significant losses incurred by Tri-State's customers.  The Bankruptcy Court found these answers to be untruthful and material, and that Great American reasonably relied on them.  Hence, the insurance policy was rescinded for equitable fraud.

The Bankruptcy Court dismissed the trustee's claim under the New Jersey Consumer Fraud Act and the claim for breach of fiduciary duty.  The trustee does not appeal these decisions.

The trustee's claim for breach of the implied covenant of good faith and fair dealing was also dismissed because the Bankruptcy Court concluded that Tri-State would not be entitled to any benefit under the policy.  Finally, the Bankruptcy Court dismissed the claim for spoliation or concealment of evidence

13

because the trustee has failed to show that it was damaged in the underlying action by the alleged spoliation or concealment.

In an opinion issued on March 21, 2006, the Bankruptcy Court granted summary judgment in favor of Great American on the loss payees' claim of equitable estoppel. (*See* TA at p. 228).  The Bankruptcy Court noted that Great American did not commit an act or omission which was designed to actively, directly, and deliberately induce the loss payees to take any action.  (TA at pp. 255-56).

## II.

This Court has jurisdiction to hear appeals from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).

On appeal, findings "of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.  "The factual determinations of the bankruptcy court must be given conclusive effect unless they are 'clearly erroneous.'"  *In re Brown*, 951 F.2d 564, 567 (3d Cir. 1991).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*,

333 U.S. 364, 395 (1948).

"Legal conclusions of a bankruptcy court, however, are subject to plenary review by the district court."  *MacArthur Executive Assoc. v. State Farm Life Ins. Co.*, 190 B.R. 189, 193 (D.N.J. 1995); *see also In re DeSeno*, 17 F.3d 642, 643 (3d Cir. 1994).


### III.

#### A.

All appellants challenge the Bankruptcy Court's decision to rescind the insurance policy.  Under New Jersey law, "a representation by the insured, whether contained in the policy itself or in the application for insurance, will support the forfeiture of the insured's rights under the policy if it is untruthful, material to the particular risk assumed by the insurer, and actually and reasonably relied upon by the insurer in the issuance of the policy."  *First American Title Ins. Co. v. Lawson*, 177 N.J. 125, 137 (2003).


#### i.

The trustee challenges the Bankruptcy Court's finding of actual and reasonable reliance by Great American.  It argues that three months before Great American renewed Tri-State's last policy, it knew that Tri-State was being investigated for

15

allegedly stealing customers' money because this information was
in the June 10, 2000, article faxed to Missal.  The trustee also
claims that Great American knew about a claim asserted against
Tri-State's predecessor, Executive Cash, involving a loss in
excess of $4 million, and that Lloyds of London had declined to
sell a policy to Tri-State in 1997.

The trustee further claims that Great American had in its
possession the financial statements of Tri-State, and was able to
ascertain that Tri-State suffered financial losses.  Thus, the
trustee argues that the evidence does not support the Bankruptcy
Court's conclusion that Great American relied on the
misrepresentations to support the equitable fraud claim.  The
trustee does not dispute the Bankruptcy Court's findings on the
untruthfulness and the materiality elements.

First, Great American knew of the raid on Chesla's Ligonier
Township facility and of the fact that Chesla was under
investigation by the FBI and the IRS because an AMSEC employee
faxed them the article detailing these.  During trial, the
evidence established that Missal and Scheckton asked Bray to
investigate this matter in response to the article.  Mottin
assured Bray that the investigation involved only Chesla, and did
not involve Tri-State or any of Tri-State's customers.  This
evidence, to the contrary of the trustee's contention, does not
establish that Great American "knew of the fraudulent scheme for

16

which it now seeks rescission. . ."  (Trustee Br. at p. 36).  In
fact, even if the article established that Great American had
knowledge of Tri-State's conversion, the subsequent assurance
from Mottin, that the problem was limited to Chesla, negated such
knowledge and furthered Tri-State's fraudulent scheme.  *See*
*Progressive Cas. Ins. Co. v. Hanna,* 316 N.J. Super. 63, 70
(App. Div. 1998) (insured has an obligation when asked a specific
question to respond truthfully).

Furthermore, Great American's knowledge about a claim
asserted against Tri-State's predecessor and about Lloyds of
London's decline to offer a policy to Tri-State in 1997 does not
undermine the evidence at trial, which showed that no claim was
ever made by the creditor of Tri-State's predecessor against
Tri-State.  *In re Tri-State*, 332 B.R. at 723.  Appellants
speculated that because Tri-State had nearly the same management
team as Executive Cash, there may be some exposure to the new
insurer arising out of the previous loss; however, this
speculation was unsubstantiated.

Great American testified that an insurer may decline to
extend coverage for many reasons, and that this fact alone does
not necessitate heightened scrutiny of a new application.  In
addition, an inference that Great American had knowledge of Tri-
State's misrepresentation on the insurance application simply
because it was aware of a claim against Tri-State's predecessor

17

and Lloyd's refusal to insure is far-fetched and unwarranted.

Finally, the trustee claims that because Great American had the financial statements of Tri-State, it knew that Tri-State suffered operating losses.  The trustee claims that this knowledge implied that Great American knew that Tri-State falsely answered the insurance application question.  The Court rejects this argument.  The Bankruptcy Court partially based its decision to rescind the policy on the fact that Tri-State provided no response to the question that called for a description of all losses over $5,000 and corrective actions.  Failure to provide an answer in this situation indicated to Great American that Tri-State suffered no such losses, which is clearly not the case.

While titled "Loss History", the insurance application question is clearly inquiring about losses resulting from employee dishonesty, crime, theft, and disappearance, the very risks for which Tri-State sought insurance coverage.  Tri-State's financial statements, on the other hand, reflect that it had suffered operating losses, i.e., that it incurred more liabilities than received in revenue.  While both sets of documents use the term "loss", the trustee's claim that knowledge of operating losses meant knowledge of losses related to theft and dishonest is akin to comparisons of apples and oranges.

"The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the

18

right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry." *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 639 (1995). Here, no evidence suggested that Great American knew about Tri-State's misrepresentations.   Therefore, the Court rejects the trustee's arguments.

### ii.

Appellant NCR advances three agreements.[6]  First, NCR claims that an insurance application containing unanswered or incompletely answered questions, on which an insurer issued a policy without further inquiry, "must be held to have waived all right to a disclosure, or to a more complete answer, and the policy cannot thereafter, in the absence of clear proof of a fraudulent or intentional suppression of a fact, be avoided on the ground of concealment or that the answer is incomplete."[7] *Goldstein v. Metro Cas. Ins. Co.*, 81 A.2d 797, 799 (N.J. App. Div. 1951).

Appellants do not meet the *Goldstein* test because Tri-

---

[6]  NCR also raises factual challenges to the Bankruptcy Court's findings.  These challenges were addressed in III. A. i., *supra*.

[7]  Appellant American Express also makes this argument.

State's "intentional suppression of a fact" is evident.  As the
Bankruptcy Court noted, there is no ambiguity in the "Loss
History" portion of the renewal application.  Similarly, the
parties do not dispute that Tri-State and its employees were
fully aware of the three sources of loss: the conversion of
customer funds, the miscellaneous incidents of theft, and the
misappropriations by Chesla.  Despite this knowledge, Tri-State
left the "Loss History" question blank, evidently to create an
impression that there were no such losses.  This is a
misrepresentation of a material risk against which Great American
promised to insure.

The insured plaintiff in *Goldstein* never committed fraud or
misrepresentation.  Indeed, the insurance company "did not claim
that plaintiff had made any fraudulent misrepresentation or had
fraudulently concealed his condition of disability. . ."
*Goldstein*, 14 N.J. Super. at 217.  This important factual
distinction renders the holding of *Goldstein* inapplicable.

NCR then argues that the question in insurance application
calling for a description of all occurrences that may give rise
to claims for the prior five years was a subjective question, and
that Mottin's answering "N/A" was subjectively honest.[8]  NCR
claims such a response cannot constitute a ground for rescission
unless Great American can show that Tri-State knew that the

---

[8]   Appellant American Express also makes this argument.

20

answer was subjectively false.

The Court agrees that the question is a subjective one because it seeks the subjective belief of the applicant as to whether past occurrences may give rise to future claims.  Answers to subjective questions do not constitute equitable fraud if "the question is directed toward probing the knowledge of the applicant and determining the state of his mind and . . . the answer is a correct statement of the applicant's knowledge and belief. . . ." *F.D.I.C. v. Moskowitz*, 946 F. Supp. 322, 329 (D.N.J. 1996).  With respect to subjective questions, "an insurer must demonstrate not only that an answer was false, but also that the insured knew that it was false." *Id.*

In *Lawson*, the New Jersey Supreme Court concluded that when a person certifies on an insurance application that he does not know of "any circumstances or any allegations or contentions as to any incident, which may result in a claim being made," 177 N.J. at 139-40, and the same person is himself misappropriating client funds, "no reasonable factfinder could conclude anything other than that [the person who completed the application] knew his [answers and statements] to be false." *Id.* at 140.

In this case, it is undisputed that Mottin was well aware of, and personally responsible for, the significant losses incurred by Tri-State's customers when their funds were used for operating expenses.  Mottin also knew about specific incidents of

21

employee theft during 1998, 1999 and 2000.  Given the substantial
and continuing conversion of customer funds by Mottin and Feuker,
and the many specific unreported incidents of theft and loss
throughout Tri-State's history, no reasonable factfinder could
conclude anything other than that Mottin knew that the "N/A"
answer to the question requiring details about "occurrences that
may give rise to claims" was subjectively false.[9]  *See Lawson*,
177 N.J. at 140.

Finally, NCR argues that the Bankruptcy Court should have
applied the doctrine of partial rescission with respect to NCR
and other loss payees.  NCR claims that the New Jersey Supreme
Court established in *Lawson* that innocent parties in an insurance
transaction should not be punished for the misrepresentations of
the guilty ones.  (*See* NCR Br. at pp. 20-21).

In *Lawson*, the New Jersey Supreme Court recognized that
rescission is "an equitable remedy, which properly depends on the
totality of circumstances in a given case and resides within a
court's discretion."  177 N.J. at 143.  The *Lawson* court also
noted that "'[e]ven where grounds for rescission exist . . . the
remedy is discretionary.'"  *Id*. at 143-44 (quoting *Intertech*

---

[9]  The fact that Mottin pled guilty to the criminal offenses
of money laundering and conspiracy to commit money laundering, 18
U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h), is inconsistent with the
proposition that Mottin believed that Tri-State would eventually
repay the temporary "loans" from customer funds, and that he did
not believe that claims would be made by Tri-State against Great
American based on past occurrences.

*Assocs., Inc. v. City of Paterson*, 255 N.J. Super. 52, 59 (App. Div. 1992)).

Based on these principles, the *Lawson* court rescinded the legal malpractice coverage for two of the three partners of the firm who misrepresented information on the insurance application, but not for the third partner, who did not participate in any misappropriations or misstatements.[10]

*Lawson* is distinguishable from this case.  In *Lawson*, the innocent partner was directly insured by the insurer.  Coverage was procured for him individually, and no misrepresentations were made as to him.  In contrast, the only insured in this case was Tri-State.  Customers of Tri-State were not insured directly.[11] Regardless of their innocence and reliance on the existence of insurance coverage, the customers of Tri-State may only receive the benefit of coverage if Tri-State has coverage in place.

Tri-State's insurance contract is closer to "the more typical contract case", *Lawson*, 177 N.J. at 143, where rescission is appropriate when material misrepresentations were made by the

---

[10]   The *Lawson* court also grounded its decision in the fact that the law firm operated as a limited liability partnership under the Uniform Partnership Law, N.J.S.A. § 42:1-1, et seq., which shields partners from incurring liability arising solely from the wrongful acts of fellow partners.  117 N.J. at 138-40.

[11]   The "Crime General Provisions" of the insurance contract provides: ". . . this insurance is for your benefit only.  It provides no rights or benefits to any other person or organization."  (TA at p. 13).  A "loss payee" is not the same as an "additional insured."

insured, and on which the insurer relied to issue coverage.
Indeed, it is "firmly embedded in the jurisprudence of this State
. . . that a policy may be rescinded and benefits denied to the
innocent intended beneficiary based on material
misrepresentations, even when the misrepresentations are
innocent." *Palisades Safety & Ins. Ass'n v. Bastien*, 175 N.J.
144, 151 (2003).  Such a result rests on New Jersey's "strong
public policy against the proliferation of insurance fraud."  *Id.*

### iii.

Appellant Diebold claims that the insurance policy should
not have been rescinded because the Bankruptcy Court's finding
that Great American actually and reasonably relied on the
insurance application was "clearly erroneous."[12]

Diebold raises three factual challenges to the Bankruptcy
Court's findings.[13]  First, it claims that the Great American
conducted insufficient underwriting because the underwriter's
"substantive reflection of 'reasonable reliance' is . . . that
what he is being told is correct."[14]  (Diebold Br. at p. 24).

---

[12]  Appellant American Express also make these arguments.

[13]  Other factual challenges raised by Diebold are addressed
in III. A. i., *supra*.

[14]  For example, Missal testified that he put an "extreme
amount of trust" in the expectation that Tri-State would be
honest with him in the application process.  (Diebold Br. at p.
24).

24

Diebold claims that such trust in Tri-State is self-serving and misplaced. (*Id.* at pp. 24-26).

Second, Diebold claims that the Bankruptcy Court erred when it stated:

> Under that caption [Loss History] two separate questions are posed. . .
> 'Enter all claims or occurrences that may give rise to claims for the prior five years.  Check here if none (____)'
>
> . . .
>
> Under this question, there are columns intended to detail the circumstances of the occurrence or claim, including the date of the occurrence, a description of the occurrence or claim, the date of the claim, and the claim status.  The follow up question asks:  Please provide descriptions of all losses in excess of $5,000.00, including corrective action.
>
> . . .
>
> The response to the first question was: "N/A". The response space to the second question was left blank.

332 B.R. at 708.

Diebold argues that the applications actually contained three questions, not two as stated by the Bankruptcy Court.  The question allegedly omitted by the Bankruptcy Court was "Check here if none (____)."  Diebold argues that because Tri-State did not check this box, yet stated "N/A" as the answer for "[e]nter all claims or occurrences that may give rise to claims for the prior five years", the answers are inconsistent with each other and should have raised a red flag during the underwriting process.  Thus, according to Diebold, Great American should have

25

investigated such an inconsistency further and should not reasonably rely on such an answer.  (Diebold Br. at pp. 28-33).

Third, Diebold argues that Great American's effort to investigate the federal agents' raid on Chesla's office was self-serving and inadequate.  Specifically, it claims that Great American's only response to the article was speaking to Mottin, trusting Mottin's words, and relying on gossip.  (Diebold Br. at pp. 36-38).  Putting the three arguments together, Diebold claims that the Bankruptcy Court's finding of Great American's actual and reasonable reliance on the insurance application was clearly erroneous.

Even if the Court assumes that Diebold's arguments are true, they do not directly address Great American's knowledge of Tri-State's problems.  Instead, they create an inference, at most, that Great American's underwriting process was imperfect. However, under New Jersey law, the insured has the obligation to provide thorough and complete information on the insurance application.  *Lawson*, 351 N.J. Super. at 422 (*rev'd* on other grounds).  This is true "irrespective of the insurer's investigative efforts. . ."  *Id.*

New Jersey courts have also concluded that an insurer's duty to investigate "arises 'only when the independent investigation . . . discloses sufficient facts to seriously impair the value' of the application."  *Ledley v. William Penn Life Ins. Co.*, 138

N.J. 627, 639 (1995).  When the falsity of the applicant's representations is not known by the insurer when the policy is issued, but that the insurer is aware of "red flags", New Jersey courts consistently hold that the insurer's failure to investigate more fully, or to investigate at all, will not vitiate the opportunity of the insurer to reasonably rely on the presumed truthfulness of the information in the application. *See*, *e.g.*, *John Hancock Mut. Life Ins. Co. of Boston v. Cronin*, 139 N.J. Eq. 392, 398 (E. & A. 1947) (insurer who knew that applicant misrepresented certain medical history information on his application and did no further investigation may reasonably rely on the information in the application); *see also Gallagher v. New England Mut. Life Ins. Co.*, 19 N.J. 14, 18 (1955).

In *Parker Precision Products Co. v. Metropolitan Life Ins. Co.*, the Third Circuit, interpreting the New Jersey equitable rescission doctrine, determined that a further duty to investigate did not arise, and the insurer reasonably relied on the application, when inconsistencies between the application and a separate medical report submitted on behalf of the applicant did not seriously impair the value of "the insured's statements." 407 F.2d 1070, 1075 (3d Cir. 1969).  The Third Circuit also concluded that the applicant's negative but false response to the question of whether he had ever been treated for heart disease established reliance as a matter of law.  *Id.*

27

Here, the facts within Great American's underwriters' knowledge did not absolve Tri-State from responding thoroughly and truthfully on the applications, did not lessen Great American's right to rely on the application, and did not place Great American on inquiry notice to defeat its reliance on those statements.  The red flags raised at the time did not present a cohesive picture affording Great American knowledge of the falsity of the representations in the application, and did not act to "seriously impair" the value of the Tri-State application. *See also* III. A. i. *supra*.

While the content of the June 2000 article was sufficient to induce an inquiry by Great American, the insurer conducted a reasonably thorough inquiry under the circumstances.  Following the publication of the article, Great American received no indication from any source of any problem or losses at Tri-State. Rather, Mottin, president of Tri-State at the time, directly and completely denied the specific inquiry by Tri-State's broker, at Great American's direction, about whether Tri-State had experienced any losses.  Clearly, the Great American underwriters could have investigated the veracity of Tri-State's responses more vigorously.  However, even if Great American was negligent in researching the veracity of Tri-State's response, "it is simply not the law" that such negligence vitiates Great American's rescission claim.  *Lawson*, 351 N.J. Super. at 422.

Indeed, the Bankruptcy Court noted that Great American's underwriting procedures were imperfect, *Tri-State*, 332 B.R. at 726, and this Court agrees.  However, underwriting is not intended to benefit the insured, and varies widely among insurers, who are free to insure substandard risks.  An insurer who engages in poor underwriting practices does not forfeit its right to rescind a policy if the insured has misrepresented material information in the policy.  *See*, *e.g.*, *Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245, 249 (S.D.N.Y. 1984); *Cf. Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 626 n.1 (1981) ("One who engages in fraud, however, may not urge that one's victim should have been more circumspect or astute.").

iv.

Appellant Palm Desert argues that allowing the Bankruptcy Court's decision to stand would chill the presence of small or regional companies in the armored car service industry.  It reasoned that financial institutions would only engage in business with large companies whose financial strength demonstrates that they would have the ability to pay claims if the insurance company voids the insurance contract.  This would create troubling anti-trust conditions for the industry.

Palm Desert's brief cited no authority from New Jersey or

otherwise.  Thus, even if this Court agrees that affirming the Bankruptcy Court's decision has negative consequences for the industry, it is unclear that the Court has authority to reverse the Bankruptcy Court solely on that basis.

In addition, Palm Desert's argument entirely ignores the other side of this transaction.  If the insurers could not rely on the information in the application, they would charge a higher premium to compensate for the additional risk.  Such a raise in the premium may very well have the same negative effects on the armored car industry as Palm Desert fears.

Indeed, the equitable doctrines that allow the rescission of an insurance contract have been well established in New Jersey law for over 100 years.  *See*, *e.g.*, *Jones v. Mechanics' Fire Ins. Co.*, 36 N.J.L. 29 (N.J. 1872).  Hence, the risk of rescission should already be priced into the cost of doing business:

> The risk that a policy might be rescinded as the result
> of misrepresentation or concealment clearly operates as
> a brake on any temptation by the insured to
> misrepresent or conceal facts from an insurer in order
> to obtain coverage at a lower premium or on terms that
> would not be offered if the true facts were disclosed.
> The law of rescission is a major enforcement tool in
> maintaining the integrity and commercial dynamics of
> the insurance marketplace.

Joseph K. Powers, <u>Pulling the Plug on Fidelity, Crime, and All Risk Coverage:  the Availability of Rescission as a Remedy or Defense</u>, 32 Tort & Ins. L.J. 905, 907 (1997).

B.

Loss payee Appellants claim that the Bankruptcy Court erred in dismissing their counterclaims.

i.

Loss payee Appellants argue that the Bankruptcy Court erred in granting summary judgment in favor of Great American with respect to their equitable estoppel counterclaim.

To establish a claim of equitable estoppel under New Jersey law,

> the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action.  Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment.

*Phillips v. Borough of Keyport*, 107 F.3d 164, 182 (3d Cir. 1997) (*en banc*); *see also Miller v. Miller*, 97 N.J. 154, 163 (1984); *The Tax Authority, Inc. v. Jackson Hewitt, Inc.*, 377 N.J. Super. 493, 512 (App. Div. 2005).

Application of this doctrine should only be made in "'very compelling circumstances,' 'where the interests of justice, morality and common fairness clearly dictate that course.'" *Phillips*, 107 F.3d at 182 (quoting *Palatine I v. Planning Bd. of Township of Montville*, 133 N.J. 546, 560 (1993)).

Equitable estoppel has been invoked when the facts

31

demonstrate a direct and deliberate inducement by the estopped party of the other party to forego its rights.  *See, e.g., Miller*, 97 N.J. at 163; *Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 N.J. 334, 339 (1979).  For example, In *Miller*, a stepfather was estopped from disavowing responsibility for supporting his stepchildren when he actively interfered with the children's support from their natural parent, and induced reliance by the children on his financial support.

By contrast, Great American did not commit an act or omission which was designed to actively, directly and deliberately induce the loss payees to do business with Tri-State.  Great American simply informed the loss payees, by issuing the certificates of insurance, that Tri-State had procured insurance coverage, and that if insurance proceeds were payable to Tri-State, the proceeds would be jointly payable to the loss payees.  Great American did not forego its potential defenses of contract rescission.

In addition, the facts developed at trial do not demonstrate that Great American's representations to the loss payees were made "under such circumstances that it was both natural and probable that it would induce action" on the part of the loss payees.  *Phillips*, 107 F.3d at 182.

The considerations of public policy also favor refraining from applying the equitable estoppel doctrine.  In New Jersey,

32

courts have found a "strong public policy against the proliferation of insurance fraud." *Palisades Safety & Ins. Ass'n.*, 175 N.J. at 151.  While the three Appellants were innocent of any misrepresentations in this transaction, it is "firmly embedded in the jurisprudence of this State . . . that a policy may be rescinded and benefits denied to the innocent intended beneficiary based on material misrepresentations, even when the misrepresentations are innocent." *Id.*

ii.

The loss payees also raised challenges to the Bankruptcy Court's dismissal of their counterclaims on: (1) breach of contract; (2) promissory estoppel; and (3) breach of implied contract.

In order for the loss payees to state a claim for breach of contract, they must first establish that a contract existed between them and Great American.  New Jersey courts have held that the right to recover under a fidelity bond for employee defalcation belongs solely to the insured, and may not be extended to encompass claims by third parties, absent some provision to the contrary.  *Resolution Trust Corp. v. Moskowitz*, 845 F. Supp. 247, 250 (D.N.J. 1994) (vacated in part on

reconsideration).[15]

In this case, the policy expressly states that recovery under the policy is limited to the named insured, and third party claims against the insurance proceeds must be rejected.  While the coverage provided in the Great American policy to Tri-State includes both loss of customers' property held by Tri-State and loss of customers' property for which Tri-State is legally liable, the policy expressly confirms that the coverage is only for Tri-State's benefit, to cover Tri-State's losses, and "provides no rights or benefits to any other person or organization." Crime General Provisions, ¶ 12.  Under New Jersey law, when the terms of an insurance contract are clear and unambiguous, it is the court's duty to enforce the contract as written and in accordance with its plain and commonly understood meaning.[16] *Buczek v. Continental Cas. Ins. Co.*, 378 F.3d 284,

---

[15] The *Resolution Trust* court drew a clear distinction between fidelity bonds and liability insurance.  A fidelity bond is an indemnity insurance contract.  On such a contract, the insurer is liable only in the event of a loss sustained by the insured.  *Resolution Trust Corp.*, 845 F. Supp. at 250.  In other words, fidelity bonds are "not a form of third party coverage, indemnifying the insured for its liability to third persons." *Id*.  In contrast, liability insurance protects against claims for losses to persons or property not party to the contract.  *Id*.

[16] Any reliance by the loss payees on third party beneficiary status as a means to reach Great American must also be rejected.  *See Werrmann v. Aratusa, Ltd.*, 266 N.J. Super. 471 (App. Div. 1993); *Rieder Communities Inc. v. Township of North Brunswick*, 227 N.J. Super. 214 (App. Div. 1988); *Gold Mills, Inc. v. Orbit Processing Corp.*, 121 N.J. Super. 370 (Law Div. 1972).

288 (3d Cir. 2004); *see also State, DEP v. Signo Trading Int'l, Inc.*, 235 N.J. Super. 321, 332 251 (App. Div. 1989).

The endorsements issued by Great American to Tri-State do not afford loss payees a direct right of action against Great American.  Under New Jersey law, "[a] loss payee is not an insured but only a mere appointee [of the insured] who may not recover if the insured has breached any provision of the policy which would prevent recovery by him.  If the loss is not payable to the insured, it is not payable to the loss payee." *Liberty Mutual Fire Ins. Co. v. Kahlaid, Inc.*, 199 N.J. Super. 494, 497 (App. Div. 1985); *See also Rena, Inc. v. Brien*, 310 N.J. Super. 304, 317 (App. Div. 1998).

With respect to promissory estoppel, the loss payees must establish that:

    (1) a clear and definite promise by the promissor;
    (2) the promise must be made with the expectation that
    the promisee will rely thereon;
    (3) the promisee must in fact reasonably rely on the
    promise, and
    (4) detriment of a definite and substantial nature must
    be incurred in reliance on the promise.

*Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 622 (D.N.J. 1999).  The promise must be "sufficiently clear and definite," and more than an implied promise evidenced through the conduct of the parties.  *Id.*

The loss payees provided no factual support to establish that Great American affirmatively and directly represented that

they would be protected under the Tri-State policy *regardless of Tri-State's entitlement to payment*.  There is no direct promise to enforce, and no basis for the application of promissory estoppel.  Thus, the Bankruptcy Court was correct in dismissing these claims.

Finally, New Jersey law recognizes both implied-in-law and implied-in-fact contracts.  As to the former, obligations are imposed by law for the purpose of bringing justice without reference to the parties' intentions.  *See St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of North America*, 32 N.J. 17, 21 (1960).  As to the latter, an implied-in-fact contract "is in legal effect an express contract, and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words."  *R.J. Longo Constr. Co. v. Transit America, Inc.*, 921 F. Supp. 1295, 1306 (D.N.J. 1996).

Great American's only relevant conduct toward the loss payees was to issue endorsements to Tri-State to make any payments due to Tri-State jointly payable to Tri-State and to the loss payees.  Great American did not enrich itself at the expense of the loss payees.  No evidence suggests that a mutual agreement between Great American and the loss payees existed.  Thus, the Court will affirm the dismissal of these counterclaims.

C.

The trustee appeals the Bankruptcy Court's dismissal of its counterclaims of (1) spoliation of evidence; and (2) breach of the duty of good faith and fair dealing.

i.

The trustee claims that the Bankruptcy Court did not provide him with any remedy for Great American's spoliation of evidence. After this litigation commenced on June 4, 2001, the trustee served his document requests on Great American on July 19, 2001. On December 12, 2001 the Bankruptcy Court ordered Great American to comply with the trustee's document request.  No emails were produced in response to the order.

In 2002, the trustee deposed Donald West, counsel retained by William Marston, Great American's Assistant Vice President, to advise Great American on the claim.  During the deposition, the trustee learned that West had maintained a telephone log in connection with this case.  On December 4, 2002, Great American produced Donald West's telephone log and his legal research file. The telephone log consisted of a pad of paper with West's handwritten list of the telephone and email contacts between himself and Great American representatives between March 1, 2001, and June 4, 2001.

The telephone log listed eleven (11) email messages from

37

West to Scheckton, Marston and Missal, along with numerous faxes that were never provided in discovery or included in Great American's privilege log.  On December 13, 2002, Great American informed the Bankruptcy Court that it could not produce the emails because West had discarded his computer six months ago, and Great American had donated its computers to various charities and schools.  Great American also explained that it uses America Online ("AOL") as its email provider and that AOL only saved emails for 27 days.  There were no backup records of the emails.  On January 7, 2003, the Bankruptcy Court granted trustee leave to amend his counterclaim to include spoliation of evidence.

Under New Jersey law, spoliation of evidence, "is the term that is used to describe the hiding or destroying of litigation evidence, generally by an adverse party." *Rosenblit v. Zimmerman*, 166 N.J. 391, 400-01 (2001).  For a claim of intentional spoliation, the trustee must show:

(1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) That the evidence was material to the litigation;

(3) That plaintiff could not reasonably have obtained access to the evidence from another source;

(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;

(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Rosenblit v. Zimmerman*, 166 N.J. 391, 406-07 (2001).

In this case, the Bankruptcy Court found that the trustee has established elements one through four of the claim. *Tri-State*, 336 B.R. at 738. However, the trustee failed to demonstrate that he was damaged in the litigation by the concealment. The evidence established that Tri-State's 1999 and 2000 renewal applications contained material misrepresentations about past losses and occurrences which could lead to claims, on which Great American reasonably relied to issue renewal policies. In other words, Tri-State's action which led to rescission of the insurance policy was complete before 2001. The Bankruptcy Court concluded that it could not reasonably infer from the record, how information developed in March 2001 and beyond by Great American might have shed positive light on Tri-State's defenses to the rescission of the policies. This Court agrees with the Bankruptcy Court's assessment.

On appeal, the trustee urges the Court to infer or presume that the trustee's claims were damaged. However, the trustee has the burden to establish all five elements of a spoliation claim. *Rosenblit*, 166 N.J. at 407. Thus, the trustee must produce some evidence to establish the fifth element of this claim.[17] The

_____

[17] Because West was an outside counsel, he had no direct knowledge in this matter. Whatever information he possessed regarding this matter would be from two sources: (1) Great American's documents; and (2) oral communications with Great American's Employees. If West's information were from the first

Court cannot presume an element in a claim.  Because the trustee
failed to establish the fifth element in a spoliation claim, the
Court will affirm the Bankruptcy Court's ruling, dismissing the
claim for spoliation of evidence.

ii.

Finally, the trustee appeals the Bankruptcy Court's
dismissal of its counterclaim for breach of duty of good faith
and fair dealing.  The trustee provided a list of what it claims
to be examples of Great American's bad faith.  (*See* Trustee Br.
at pp. 40-41).  The trustee argues that the Bankruptcy Court was
wrong, in light of its list, to dismiss this claim.

The New Jersey Supreme Court has recognized that every
contract in New Jersey contains an implied covenant of good faith
and fair dealing.  *R.J. Gaydos Ins. Agency, Inc. v. National
Consumer Ins. Co.*, 168 N.J. 255 (2001).  With respect to
insurance contracts, "[m]ost jurisdictions have characterized a
cause of action for bad-faith failure to pay an insured's claim
as a tort that arises out of the implied duty of an insurance
company to deal fairly and act in good faith in processing the
claims of its policyholder."  *Pickett v. Lloyd's*, 131 N.J. 457,

---

source, these documents, to the extent discoverable, would be
available to the trustee for inspection.  If West's information
were from the second source, it would be protected by attorney-
client privilege.  *See Upjohn v. United States*, 449 U.S. 383
(1981).

469 (1993).  However, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim."  *Id.* at 473.

Under *Pickett*, the trustee would be able to assert a claim for Great American's bad faith failure to pay his claim if he could first establish a right to summary judgment as to his underlying claim.  *Pickett*, 131 N.J. at 473; *see also Tarsio v. Provident Insur. Co.*, 108 F. Supp. 2d 397 (D.N.J. 2000).  Because Great American is entitled to rescission of the policy, the trustee has no legal claim for coverage, and is therefore not be entitled to summary judgment.  The trustee could not state a viable claim for bad faith under New Jersey law, and the Court will affirm the Bankruptcy Court's decision.

## IV.

For reasons set forth above, the Bankruptcy Court's opinions are affirmed.  The Court will issue an appropriate order.


Date: April 23, 2007


_____
s/Joseph E. Irenas
**JOSEPH E. IRENAS**
Senior United States District Judge

41